

FILED

JUN 2 8 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA
1100 Fifteenth Street, N.W.,
Washington, DC 20005

Plaintiff,

v.

THE HONORABLE TOMMY G. THOMPSON,
in his official capacity as
SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Ave., S.W.
Washington, D.C. 20201

and

THOMAS A. SCULLY,
in his official capacity as
ADMINISTRATOR,
CENTERS FOR MEDICARE & MEDICAID SERVICES
314G Hubert H. Humphrey Bld.
200 Independence Avenue, S.W.
Washington, D.C. 20201

Defendants.

Civil Action No

CASE NUMBER 1:02CV01306

JUDGE: Louis F. Oberdorfer

DECK TYPE: Administrative Agency Review

DATE STAMP: 06/28/2002

**COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF**

Plaintiff, Pharmaceutical Research and Manufacturers of America ("PhRMA"), for its complaint against defendants The Honorable Tommy G. Thompson, Secretary of the United States Department of Health and Human Services (the "Secretary"), and Thomas A.

Scully, Administrator of the Centers for Medicare & Medicaid Services (the "Administrator" of "CMS"), asserts as follows:

## INTRODUCTION

1. This lawsuit challenges defendants' approval of a prescription drug program called the Michigan Pharmaceutical Best Practices Initiative (the "Michigan Initiative"). Defendants approved the Michigan Initiative on January 24, 2002, and the State of Michigan began phasing in implementation of the Michigan Initiative on February 25, 2002. The Michigan Initiative requires defendants' approval because it uses the federal Medicaid program to impose restrictions on patients' care in order to extract extraordinary – and illegal – discounts from prescription drug manufacturers such as plaintiff's members. In so doing, the Michigan Initiative threatens Medicaid beneficiaries' access to prescription drugs putting those beneficiaries' care at risk.

2. The Secretary's approval of the Michigan Initiative violates federal law in four independent ways.

First, the Michigan Initiative creates a Medicaid prescription drug formulary – a list of prescription drugs for which reimbursement is automatically provided to Medicaid beneficiaries – that violates the statutory requirements for such a formulary in the Social Security Act. All prescription manufacturers who wish to participate in the Medicaid program are required to enter into Medicaid "rebate agreements" with the Secretary. Pursuant to the rebate agreements, the manufacturers provide discounts (in the form of rebates) on all prescription drugs dispensed to Medicaid beneficiaries by the States. In return, the manufacturers are guaranteed that their drugs will be included in each state's Medicaid prescription drug program unless they meet specific federal statutory requirements for exclusion. Critically, if the state establishes a formulary, all such manufacturers' drugs must be included in the formulary, except



\\\DC - 64836/0021 - 1452016 v12

those drugs excluded on the basis of a written determination by the specially-composed formulary committee that the drug lacks a "significant, clinically meaningful therapeutic advantage" over other drugs included on the formulary. 42 U.S.C. § 1396r-8(d)(4)(A) – (C).

Inclusion in the formulary is of critical importance, because drugs that are not on the formulary are not eligible for Medicaid reimbursement – and thus will not be dispensed – unless and until they are authorized, on a prescription-by-prescription basis, by the state at the specific request of the prescribing physician and/or the dispensing pharmacy. Most physicians and pharmacies do not take the time to go through this time-consuming "prior authorization" process for a Medicaid beneficiary; therefore, most physicians will not prescribe drugs that are "off formulary," even if the drugs on the formulary that could be alternatives for some patients have significant disadvantages, such as increased risk of side effects or decreased efficacy. It is for this reason that drugs subject to prior authorization suffer precipitous declines in usage.

The Michigan Initiative violates the Act because, inter alia, it excludes drugs from the Michigan Medicaid formulary based solely on price. Specifically, the Michigan Initiative provides that if prescription drug manufacturers want their drugs to be included on the formulary, they must provide "supplemental rebates" well beyond those set forth in the Medicaid rebate statute, so that the state's net payment for the drug equals the lowest price charged in the United States for any drug in the same broadly-defined therapeutic class, as defined by the State. Further, manufacturers must also provide basic rebates to the state in non-Medicaid programs, which must equal the rebates currently paid in the Medicaid program. Under the Michigan Initiative, manufacturers who refuse to provide such "supplemental" and non-Medicaid rebates demanded by the State will have their drugs excluded from the formulary, dramatically reducing the availability of their drugs to Medicaid beneficiaries and the usage of those drugs – whether or

not the requisite finding that their drug provides no "significant, clinically meaningful therapeutic advantage" has been made. For this reason, the Michigan Initiative violates the Act's limitations on formulary exclusion set forth in 42 U.S.C. § 1396r-8(d)(4).

3. Second, the Secretary's approval of the Michigan Initiative also violates the Act by requiring manufacturers to pay "supplemental" rebates. The Act provides that the federal Medicaid rebate agreements between manufacturers and the Secretary are "on behalf of States," 42 U.S.C. § 1396r-8(a)(1); thus, when a manufacturer enters into a Medicaid rebate agreement it gains access to Medicaid beneficiaries in all fifty states and the District of Columbia. The statute contemplates that states might negotiate separate agreements with manufacturers instead of collecting rebates under the Secretary's agreement, but it does not allow the Secretary to grant states authority to augment the rebates required under the Secretary's agreement by demanding additional (i.e., "supplemental") rebates. The separate state agreements contemplated by the Act are designed to provide alternatives to the Secretary's agreement, providing flexibility for manufacturers and States to negotiate arrangements more like those used by commercial health plans, provided that the State's bargain does not result in rebates which, in the aggregate, total less than those provided by the Secretary's agreement. (Thus, for example, the state and a manufacturer might negotiate a steeper rebate on some drugs, and a lesser rebate on others.) What the Act does not allow, and what the Secretary has authorized in the Michigan Initiative, is a "supplemental" rebate agreement under which State is assured that it can collect the federal rebate as a "floor" no matter what the fate of its negotiations with a manufacturer, and also use the threats of prior authorization to demand such additional amounts from the manufacturer as it chooses.

4. Third, the Secretary's approval of the Michigan Initiative permits the State to use the threat of prior authorization in Michigan's Medicaid prescription drug program to coerce rebates to non-Medicaid recipients. Under the Initiative, manufacturers are required to provide the rebates payable under the Secretary's agreement for Medicaid beneficiaries to all non-Medicaid Initiative beneficiaries. Manufacturers who refuse to do so are subject to prior authorization of drugs prescribed for Medicaid beneficiaries. Prior authorization severely compromises Medicaid beneficiaries' access to care, since prior authorized drugs are less likely to be prescribed, whether or not they are medically necessary or appropriate for the patient. But the Act requires that any state prescription drug program be provided "in a manner consistent with the best interests of [Medicaid] recipients." 42 U.S.C. § 1396a(a)(19). Here, the Initiative approved by the Secretary puts Medicaid beneficiaries' care at risk in order to coerce rebates for non-Medicaid beneficiaries. The Act prohibits this result.

5. Fourth, the Michigan Initiative requires rebates at levels that are explicitly tied to the prices of all drugs in each therapeutic class "within the United States." The Commerce Clause of the United States constitution prohibits such out-of-state pricing "benchmarks," because they necessarily affect the prices that will be charged in future out-of-state transactions, and therefore have an impermissible extraterritorial reach.

6. Because the Secretary's approval of the Michigan Initiative exceeds his authority under the Act, the Court should enjoin the Michigan Initiative to prevent violations of law and irreparable injury. Plaintiff's members and Michigan Medicaid beneficiaries stand to be irreparably injured if the Michigan Initiative is fully implemented. When a member's pharmaceutical drugs are arbitrarily subjected to prior authorization or are excluded from formulary lists, members of the health community do not prescribe those drugs with the same

frequency, if at all, and usage of the member's drugs declines. Likewise, Medicaid beneficiaries are denied access to drugs critical to their care. Through approval of the Michigan Initiative, the Secretary puts plaintiff's members and other prescription drug manufacturers in the impossible position of having to choose between paying unlawful supplemental rebates or being effectively excluded from providing drugs to Medicaid patients in Michigan through the illegal Michigan formulary.

## PARTIES

7. Plaintiff PhRMA is a non-profit corporation organized and existing under the laws of the state of Delaware. PhRMA maintains its principal office in Washington, D.C.

8. PhRMA's members are a number of the country's research-based pharmaceutical and biotechnology companies, each of which is devoted to inventing medicines that allow patients to lead longer, healthier, and more productive lives. PhRMA is committed to, inter alia, advancing public policies that foster continued innovation and educating the public about the drug development and discovery process.

9. PhRMA members include manufacturers of over 75 percent of brand-name prescription drugs sold in the United States. (A list of PhRMA's members and additional materials regarding PhRMA are available at http://www.phrma.org.)

10. Among other things, PhRMA represents its members on a nationwide basis with regard to legislative, political and social issues in which its members have an interest. PhRMA serves as one of the members' policy advocates, representing its members' interests in matters before Congress, the Executive Branch, state regulatory agencies and legislatures, and the courts.

11. PhRMA has represented its members in connection with CMS's consideration of the Michigan Initiative and with the Michigan legislature's consideration of the Initiative.

12. PhRMA brings this suit on behalf of its members. Most of PhRMA's members have been and will be injured individually by the Secretary's express or implicit approval of state programs like the Michigan Initiative. Neither the claims asserted nor the relief demanded necessitates the participation of individual PhRMA members in this lawsuit.

13. Defendant Tommy G. Thompson, the Secretary of the United States Department of Health and Human Services ("HHS"), is charged with the responsibility to implement the provisions of Title XIX of the Social Security Act, as amended, 42 U.S.C. § 1396 et seq. (the "Act" or "SSA "). The Secretary administers the Medicaid program through CMS, a component of HHS. The Secretary is sued in his official capacity only.

14. Defendant Thomas A. Scully is the Administrator of CMS. Defendant Scully is sued in his official capacity only.

## JURISDICTION AND VENUE

15. Subject matter jurisdiction is founded on 28 U.S.C. § 1331 because this case arises under the laws of the United States. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

16. Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e) because, inter alia, the defendants, agencies and employees of agencies of the United States, reside within this judicial district, a substantial part of the events giving rise to the claims herein occurred within this judicial district, and the plaintiff resides in this judicial district.

## BACKGROUND

### The Medicaid Program

17. The Medicaid program was enacted in 1965 as a cooperative venture between the federal and state governments to assist states in the provision of medical care to eligible low-income individuals. The primary objective of the Medicaid program is "to furnish (1) medical

assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose incomes are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396.

18. Although it is administered by the states, Medicaid is federally assisted and operates under federal statutes, regulations and guidelines. The definitions and limitations of both "medical assistance" and the populations that must and/or may be served under a state's program are established in federal law.

19. The federal and state governments jointly fund the Medicaid program. Funding levels provided by the federal government to the state are established by a statutory formula under which state expenditures on "medical assistance" pursuant to a federally approved state plan are matched by the federal government at a matching rate computed for each state. Such federal funding is known as "federal financial participation" (or "FFP").

20. Each state prepares a "Medicaid State Plan" which describes both (a) permissible medical assistance the state has elected to make available; and (b) the beneficiaries among those eligible under the federal statute to whom the plan applies. Statutory requirements for state plans are set forth in 42 U.S.C. § 1396a. Among other things, the Act requires that the State plan "provide such safeguards as may be necessary to assure that . . . care and services will be provided, in a manner consistent with simplicity of administration and the best interests of [Medicaid] recipients." 42 U.S.C. § 1396a(a)(19).

21. Under the Medicaid program, states pay providers and suppliers of medical assistance established rates for services provided to individuals eligible under the state plan. The

federal government then pays to the states the statutorily-established federal share of "the total amount expended . . . as medical assistance under the State plan . . . ." 42 U.S.C. § 1396b(a)(1).

Medicaid Rebate Agreements

22. Under the Act, states may provide a prescription drug benefit to Medicaid beneficiaries. Current Medicaid prescription drug sales nationwide total approximately $20 billion per year.

23. With regard to prescription drugs, the Medicaid statute includes a program designed to return to the state and federal governments a portion of their outlays for prescription drugs provided to Medicaid beneficiaries. 42 U.S.C. § 1396r-8. Under this rebate program, in order for any state to receive federal funds to pay for any of the manufacturer's drugs, the manufacturer must enter into an agreement with the Secretary "on behalf of states" to pay a rebate to every state on all of its covered outpatient drugs paid for by Medicaid. 42 U.S.C. § 1396r-8(a)(1).

24. PhRMA members and other pharmaceutical manufacturers that want their drugs to be available to Medicaid beneficiaries under the Medicaid program are required to enter into rebate agreements with the Secretary or the states to provide rebates to reduce the costs of prescription drug coverage. 42 U.S.C. § 1396r-8(a)(1).

25. PhRMA members participate in the Medicaid drug rebate program and have entered into Medicaid rebate agreements.

26. Under the rebate agreements, the manufacturers pay rebate amounts regulated by statute directly to each state based on the number of units of their drugs dispensed to Medicaid beneficiaries and paid for by the state under the state's Medicaid plan. 42 U.S.C. § 1396r-8(b), (c); 56 Fed. Reg. 7049 (1991). These "Rebate Payment[s]" are paid on a quarterly basis to the

applicable state Medicaid Agency. 56 Fed. Reg. 7049 at Section II(a). The specific rebate amounts are based on state reports on the utilization of each manufacturer's covered outpatient drugs by Medicaid beneficiaries in the state. Id. at Section II(b). The state then reimburses the federal government for its share of the rebates.

27. The Medicaid rebate agreements provide that challenges to state determinations of utilization data are through, inter alia, a "State hearing mechanism available under the Medicaid Program." Id. at Section V(c). Thus, the lone administrative challenge PhRMA members might make under the rebate agreement pertains only to the correctness of the utilization data. The rebate agreements set forth no administrative remedy for PhRMA members to challenge the Secretary's express or implicit approval of state Medicaid programs or of "supplemental" rebate agreements.

28. As an alternative to the federal rebate agreement, the Act allows the Secretary to "authorize a State to enter directly into agreements with a manufacturer." Id. This provision allows a state to negotiate on its own behalf instead of taking the fixed rebate amounts and terms established by the statute for the federal agreement "on behalf of the states." Pursuant to statute, the aggregate amount of rebates negotiated by a State in a separate agreement may not be less than that available to states under the Secretary's rebate agreement with the manufacturer. 42 U.S.C. 1396r-8(a)(4). Thus, on a drug-by-drug basis, the separate agreement may call for some drugs to be provided at lower rebate levels, and others at higher levels, than those to be collected under the Secretary's agreement.

29. Although separate rebate agreements may be entered by the States, the Act does not authorize "supplemental" rebate agreements (i.e., rebate agreements between the states and



\\\DC - 64836/0021 - 1452016 v12

manufacturers that have the sole purpose of providing rebates that are in addition to, rather than alternatives to, the rebates collectable under Secretary's rebate agreement).

Medicaid Drug Formularies

30. The Act allows States to establish Medicaid drug formularies, which are lists of prescription drugs for which reimbursement is automatically provided to Medicaid beneficiaries. 42 U.S.C. § 1396r-8(d)(4).

31. State Medicaid formularies must comply with a number of requirements. Among other things, the formulary must be "developed by a committee consisting of physicians, pharmacists, and other appropriate individuals appointed by the Governor." 42 U.S.C. § 1396r-8(d)(4)(A).

32. Further, except as provided in the Act, the Medicaid formulary must include "the covered outpatient drugs of any manufacturer which has entered into and complies with" a Medicaid rebate agreement. 42 U.S.C. § 1396r-8(d)(4)(C).

33. The Act allows states to exclude from the Medicaid formulary only those drugs for which, "with respect to the treatment of a specific disease or condition . . . the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness or clinical outcome of such treatment . . . over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion." 42 U.S.C. § 1396r-8(d)(4)(D).

34. Drugs that are excluded from the state's Medicaid formulary must nonetheless be available under a prior authorization program. See 42 U.S.C. § 1396r-8(d)(5).

Prior Authorization

35. A formulary is a list of drugs for which reimbursement is automatically provided. Prior authorization is a tool to allow the State to provide reimbursement for a drug that is not included on the formulary. When a drug is subject to prior authorization, reimbursement is not provided unless and until the particular prescription is authorized.

36. Typically, prior authorization can only be obtained by the prescribing physician, who must contact the state official responsible for prior authorization and justify the patient's need for the particular drug at issue. Obtaining prior authorization thus can be a time-consuming, and potentially frustrating, process for the physician. Indeed, the objective of prior authorization is to discourage physicians from prescribing drugs that are "off formulary."

37. Requiring physicians to obtain prior authorization each time they wish to prescribe a particular drug for a particular patient has a substantial impact on the extent to which the drug is prescribed. This is because physicians generally respond to the inconvenience and burden imposed by prior authorization requirements by considering only drugs that may be prescribed without prior authorization when deciding their patients' courses of treatment. Requiring prior authorization thus typically reduces sales and usage for a drug and denies patients access to drugs that their physicians would have preferred as a course of therapy.

38. In many cases, the prescription drug subject to prior authorization is the physician's first choice because it is more likely to be effective or has fewer or less dangerous side effects than the drug available on the formulary.

The Michigan Initiative

39. The Michigan Department of Community Health ("DCH") administers several Medicaid and non-Medicaid programs under which prescription drugs are made available to

qualifying participants, and the state pays some portion of the cost. Among other things, DCH administers the State's Medicaid prescription drug program. Under that program, the state and federal governments share almost all of the cost of prescription drugs for Medicaid beneficiaries. Manufacturers of single source and innovator multiple source drugs contribute rebates of at least 15.1 percent of the "average manufacturer price" of the drug, while manufacturers of noninnovator generic drugs contribute rebates equal to 11 percent of the average manufacturer price. 42 U.S.C. § 1396r-8(c). Medicaid beneficiaries may also be required to make a "nominal" copayment for prescriptions under the Act. See 42 U.S.C. 1396o(a)(3), (b)(3); 66 Fed. Reg. 2490, 2583 (1991).

40. DCH also administers a number of other programs on behalf of certain individuals in Michigan (the "Non-Medicaid Programs"). These programs are funded by the State and with beneficiary copayments. For example, DCH administers the State Medical Program, which provides basic ambulatory medical care to approximately 45,000 low-income people who do not qualify for Medicaid. Approximately 315,000 individuals receive prescription drug benefits administered by DCH through the various Non-Medicaid programs in Michigan.

41. Before the implementation of the Michigan Initiative, manufacturers participating in the Medicaid program paid the State a rebate pursuant to the prescription drug provision of the federal Medicaid statute. 42 U.S.C. § 1396r-8. Manufacturers did not pay the State any "supplemental" rebates for drugs covered by the Medicaid program, and they did not pay the State any rebates for drugs covered by non-Medicaid programs.

42. On October 5, 2001, DCH submitted for defendants' approval a State Plan amendment setting forth the critical provisions of the Michigan Initiative. Four days later, DCH

announced the Initiative to the public (and affected drug manufacturers) by way of a letter from James K. Haveman, Jr., Director of DCH.

43. Among other things, the Initiative creates a list of all prescription drugs covered under both Medicaid and Non-Medicaid programs called the Michigan Pharmaceutical Product List ("MPPL"). The MPPL was initially composed of only a few "preferred" drugs with all others subject to prior authorization. However, the Initiative provides for the prior authorization restrictions to be waived with regard to any prescription drug manufacturer's products if that manufacturer submits to the measures described below, most notably, by agreeing to pay supplemental rebates under Michigan's Medicaid State plan and by agreeing to pay rebates equivalent to those required by the Secretary's agreement to beneficiaries of Michigan's non-Medicaid programs.

44. At the same time that Michigan sought the Secretary's approval of the Initiative, Michigan's Governor John Engler established by Executive Order the Michigan Pharmacy and Therapeutics Committee (the "Michigan Committee") to develop the State's prescription drug formulary. See Exec. Order 2001-8 (Oct. 5, 2001) at 2. The Michigan Committee's composition is consistent with the Act's requirements for Medicaid formulary development, see 42 U.S.C. § 1936r-8(d)(4)(A), and the Executive Order signed by Governor Engler explicitly references the Act. See Exec. Order 2001-8 at 2.

45. Pursuant to the Initiative, the MPPL is a formulary, i.e., a list of products for which reimbursement will be available to Medicaid beneficiaries. See 42 U.S.C. 1396r-8(d)(4).

46. DCH presented prescription drug manufacturers with two agreements when it announced the new program on October 9 (collectively, the "Michigan Initiative Agreements"). The first agreement, the "Michigan Non-Medicaid State Funded Agreement" (the "Non-

Medicaid Agreement"), requires drug manufacturers to pay basic rebates to the state for drugs in non-Medicaid programs, which must equal the rebates ordinarily paid in the Medicaid program. The second agreement, the "State of Michigan Supplemental Drug-Rebate Agreement" (the "Supplemental Rebate Agreement"), requires drug manufacturers to pay supplemental rebates on drugs prescribed to Medicaid beneficiaries, which, when combined with the basic rebates just described, would reduce the price of a drug to the state in the Medicaid programs to a reference price for the drug.

47. The Non-Medicaid Agreement must be entered on a manufacturer-by-manufacturer basis, i.e., a manufacturer cannot agree to pay the Non-Medicaid rebate on some, but not all, of its drugs. Non-Medicaid Agreement at Section 3.1.2. Failure to pay the rebates required by that Agreement subjects all of a manufacturers' drugs to prior authorization and exclusion from the MPPL. Id. at Part IV and Section 5.1.

48. The Supplemental Rebate Agreement requires manufacturers to pay rebates sufficient to bring the prices of their drugs down to the "reference price." This price is the "best price" available "within the United States" for any drug in the same therapeutic class as the drug at issue offered by any manufacturer. See Supplemental Rebate Agreement at Sections 3.2, 4.2. In other words, manufacturers must match the lowest price offered for any drug in the class by any manufacturer, anywhere in the United States.

49. Michigan determines the therapeutic classes for which the reference prices are set. On information and belief, Michigan has not announced the basis for the determination of such therapeutic classes. No such therapeutic classes are established under Medicaid.

50. The Supplemental Rebate Agreement can be entered on a product-by-product basis, see Supplemental Rebate Agreement at Sections 3.3, 4.2, but any drugs for which

supplemental rebates are not paid are subject to prior authorization and exclusion from the MPPL. Id. at Section 5.1. Supplemental rebates must be paid on all Medicaid beneficiaries' prescriptions.

51. In order to avoid being taken off the MPPL and thus being subject to prior authorization for all of its drugs, a manufacturer must pay the rebates demanded by the Non-Medicaid Agreement – i.e., it must pay the basic rebate for all of its drugs to all non-Medicaid programs. See Non-Medicaid Agreement at Section 2.1. But even if the manufacturer agrees to do so, it will nonetheless be excluded from the MPPL, and subjected to prior authorization in Michigan's Medicaid program, on a drug-by-drug basis for any drug for which it refuses to pay the supplemental rebates demanded in the Supplemental Rebate Agreement. Thus, under the Michigan Initiative, a manufacturer may avoid prior authorization with respect to any particular drug only by agreeing to pay the state both the Supplemental and the non-Medicaid rebates. If a manufacturer does not agree to pay both of these rebates for a drug, that drug (and possibly all the manufacturers' drugs) will be subjected to prior authorization under Medicaid.

52. Reimbursement for drugs that are on the MPPL is automatic, thus ensuring that these drugs will be available to Medicaid beneficiaries. In contrast, drugs that are subject to prior authorization will not be reimbursed, and thus cannot be prescribed, unless and until the prescribing physician completes a number of steps. First, the prescribing physician must consult a copy of the MPPL or software provided by a state contractor to determine whether the first-choice treatment is subject to prior authorization. If so, the prescribing physician or the physician's designee must then contact a "pharmacy benefits manager technician" by letter, facsimile or telephone. The prescribing physician may provide detailed patient information in writing, including the names of other non-prior authorized medications previously prescribed,

the dates of such prescriptions, the patient's clinical outcome, and the medical reason for any therapeutic failure with such prior medications. If the prescribing physician chooses instead to contact the pharmacy benefits manager technician by telephone, the state contractor asks the prescribing physician a series of questions seeking similar information to that above. If the prescribing physician's answers do not meet criteria dictated by the Michigan Committee, then the prescribing physician must proceed through additional layers of review to determine the drug's "medical necessity," including questioning by another administrative "benefits manager" and questioning by a licensed physician. Only the prescribing physician may appeal a denial of prior authorization.

53. According to DCH, the State began testing the prior authorization software by processing prior authorization requests from prescribing physicians without actually subjecting any manufacturers' drugs to prior authorization on February 1, 2002. From February 25, 2002 to March 18, 2002, DCH began requiring prior authorization of specific drugs in phases. According to DCH, the Michigan Initiative became fully operational on March 19, 2002.

54. Manufacturers have no way of obtaining relief from Michigan's imposition of prior authorization on their drugs apart from paying the illegal rebates the Secretary has authorized Michigan to collect.

55. Because Michigan has not waived sovereign immunity, PhRMA members and other prescription drug manufacturers have no effective recourse to seek a refund from Michigan once the rebate payments are actually made.

56. PhRMA's members have no means of avoiding harm to their business resulting from the Secretary's approval of state programs apart from the relief that this Court may grant.

The Secretary's Approval of the Michigan Initiative

57. The Secretary is required to approve all Medicaid State plans. 42 U.S.C. § 1396. Any State Medicaid program that utilizes prior authorization must amend its State Plan to include the prior authorization requirements. 42 U.S.C. § 1396r-8(d)(5). Further, 42 U.S.C. §§ 1396r-8(a)(1) & (4) explicitly require the Secretary's approval for the collection of any Medicaid rebates by the states other than under the federal rebate agreement. Thus, the Medicaid statute requires all three of these Secretarial approvals before Michigan can implement the Michigan Initiative.

58. The Secretary's approval of the Michigan Initiative on January 24, 2002, provided all three approvals.

59. On information and belief, a number of other states have sought, or intend to seek, approval from the Secretary for programs that violate the Act in the same way, or ways, that the Michigan Initiative does. Approval for these programs could come at any time.

The Administrative Procedure Act

60. The Administrative Procedure Act ("APA") provides for judicial review of federal agency actions. 5 U.S.C. §§ 701–706. Under the APA, a court may hold unlawful and set aside federal agency action that is "in excess of statutory jurisdiction, authority, or limitations" or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). The Secretary's written approval of the Michigan Initiative violates the Social Security Act. Accordingly, the Court should vacate the Secretary's approval of the Michigan Initiative and issue injunctive and declaratory relief to prevent the serious harms that will result from implementation of that Initiative.

**COUNT I (Against All Defendants)**

**RELIEF REQUESTED UNDER THE ADMINISTRATIVE PROCEDURE ACT Violation of Section 1927 of the Social Security Act (42 U.S.C. § 1396r-8)**

**Approval of Illegal Drug Formularies**

61. Paragraphs 1–60 are incorporated by reference herein.

62. Under 42 U.S.C. § 1396r-8(d)(4)(B), all drugs covered by a rebate agreement with the Secretary must be included in any Medicaid formulary established by a State for the reimbursement of pharmaceutical drugs provided to Medicaid beneficiaries.

63. The Michigan Initiative establishes a Medicaid formulary.

64. The Act permits a state to exclude a drug covered by a rebate agreement under 42 U.S.C. § 1396r-8(a)(1) from a Medicaid formulary only if the state formulary committee established under 42 U.S.C. § 1396r-8(d)(4)(A) has first made a written, public determination that the drug lacks a significant, clinically meaningful therapeutic advantage over other drugs included in the formulary with respect to a specific disease or condition. 42 U.S.C. § 1396r-8(d)(4)(D).

65. The Michigan Initiative excludes drugs covered by rebate agreements with the Secretary from the State's Medicaid formulary based on price rather than the criteria set forth in the Act. The Michigan Initiative excludes drugs based on the manufacturer's refusal to pay additional rebates above those negotiated by the Secretary pursuant to the terms of the Supplemental Rebate Agreement and the Non-Medicaid Agreement. Such drugs also are excluded from the State's Medicaid formulary without the written, public determination of therapeutic advantage as required by 42 U.S.C. § 1396r-8(d)(4)(C) by a state formulary committee established under 42 U.S.C. § 1396r-8(d)(4)(A).

66. The Secretary's approval of Michigan's Medicaid drug formulary, which violates the Act, was not in accordance with the law, was in excess of statutory limitations, and violates the APA.

67. PhRMA and its members have no adequate remedy at law.

68. The Secretary's approval of the Michigan Initiative, which violates the Act, will cause substantial, imminent and irreparable injury to PhRMA's members unless (a) that approval is vacated; (b) the Secretary is required to preclude Michigan from using Medicaid prior authorization to implement the illegal Michigan Initiative; and (c) the Secretary is enjoined from (i) terminating the Medicaid rebate agreement of any manufacturer that refuses to pay rebates required under the illegal Michigan Supplemental Rebate Agreement or the Non-Medicaid Agreement, (ii) approving any like prior authorization formulary program in Michigan or any other state, (iii) approving any like supplemental rebate agreement for Michigan or any other state, (iv) requiring manufacturers to pay supplemental rebates, and (v) requiring manufacturers to pay rebates on state program beneficiaries' prescription drug purchases invoiced by Michigan or by any state based on a like program.

**COUNT II (Against All Defendants)**

**RELIEF REQUESTED UNDER THE ADMINISTRATIVE PROCEDURE ACT**
**Violation of Section 1927 of the Social Security Act (42 U.S.C. § 1396r-8)**

**Approval of Supplemental Rebates**

69. Paragraphs 1–68 are incorporated by reference herein.

70. Section 1927(a)(1) of the Act provides for manufacturers to enter into rebate agreements with the Secretary "on behalf of States." Specifically, the Act provides that a federal agreement is required for federal financial participation, "except that, the Secretary may

authorize a State to enter directly into agreements with a manufacturer." 42 U.S.C. § 1396r-8(a)(1). Therefore, the Act allows separate, but not additional or supplemental, State rebate agreements.

71. There is no express statutory authority for the Secretary to approve supplemental rebates.

72. The Secretary's approval of supplemental rebates in the Michigan Initiative was in violation of the Act, and, therefore, was not in accordance with the law, was in excess of statutory limitations, and violates the APA.

73. PhRMA and its members have no adequate remedy at law.

74. The Secretary's approval of the Michigan Initiative, which violates the Act, will cause substantial, imminent and irreparable injury to PhRMA's members unless (a) that approval is vacated; (b) the Secretary is required to preclude Michigan from using Medicaid prior authorization to implement the illegal Michigan Initiative; and (c) the Secretary is enjoined from (i) terminating the Medicaid rebate agreement of any manufacturer that refuses to pay rebates required under the illegal Michigan Supplemental Rebate Agreement or the Non-Medicaid Agreement, (ii) approving any like prior authorization formulary program in Michigan or any other state, (iii) approving any like supplemental rebate agreement for Michigan or any other state, (iv) requiring manufacturers to pay supplemental rebates, and (v) requiring manufacturers to pay rebates on state program beneficiaries' prescription drug purchases invoiced by Michigan or by any state based on a like program.

**COUNT III (Against All Defendants)**

**RELIEF REQUESTED UNDER THE ADMINISTRATIVE PROCEDURE ACT**
**Violation of Sections 1901 and 1902 of the Social Security Act**
**(42 U.S.C. §§ 1396 and 1396(a))**

**Approval of Programs Leveraging Medicaid to Exploit Beneficiaries for the Benefit of Non-Medicaid Individuals**

75. Paragraphs 1–74 are incorporated by reference herein.

76. The Act provides that the purpose of Medicaid is to furnish "medical assistance," including reimbursement for medical services such as prescription drugs, to beneficiaries. 42 U.S.C. § 1396.

77. The Act requires that all State Plans include "such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with . . . the best interests of [Medicaid] recipients." 42 U.S.C. § 1396a(a)(19).

78. The Michigan Initiative violates the Act by threatening the provision of care to Medicaid beneficiaries in order to obtain rebates for members of the non-Medicaid population in Michigan. The Michigan Initiative imposes prior authorization on Medicaid prescription drugs in the event that manufacturers refuse to provide rebates to members of the non-Medicaid population in Michigan. Prior authorization restricts Michigan beneficiaries' access to needed prescription drugs. Moreover, no Medicaid purpose is served by the Initiative, since the only benefit provided would be a reduction of prescription drug prices for persons who are not Medicaid beneficiaries.

79. The Michigan Initiative thus puts at risk Medicaid beneficiaries' care for the benefit of persons who are not Medicaid beneficiaries.

80. The Secretary's approval of the Michigan Initiative violated the Act, and, therefore, was not in accordance with the law, was in excess of statutory limitations, and violates the APA.

81. PhRMA and its members have no adequate remedy at law.

82. The Secretary's approval of the Michigan Initiative, which violates the Act, will cause substantial, imminent and irreparable injury to PhRMA's members unless (a) that approval is vacated; (b) the Secretary is required to preclude Michigan from using Medicaid prior authorization to implement the illegal Michigan Initiative; and (c) the Secretary is enjoined from (i) terminating the Medicaid rebate agreement of any manufacturer that refuses to pay rebates required under the illegal Michigan Supplemental Rebate Agreement or the Non-Medicaid Agreement, (ii) approving any like prior authorization formulary program in Michigan or any other state, (iii) approving any like supplemental rebate agreement for Michigan or any other state, (iv) requiring manufacturers to pay supplemental rebates, and (v) requiring manufacturers to pay rebates on state program beneficiaries' prescription drug purchases invoiced by Michigan or by any state based on a like program.

## COUNT IV (Against All Defendants)

### RELIEF REQUESTED UNDER THE ADMINISTRATIVE PROCEDURE ACT
### Violation of the Commerce Clause of the United States Constitution

### Approval of Price Benchmarking

83. Paragraphs 1–82 are incorporated by reference.

84. The Commerce Clause of the United States Constitution, art. I, § 8, cl 3, prohibits a state from tying in-state prices to prices charged in other jurisdictions.

85. Both the Non-Medicaid Agreement and the Supplemental Rebate Agreement employ "benchmarking" to tie the prices manufacturers must charge to Michigan State Medicaid plan beneficiaries and Non-Medicaid beneficiaries to prices paid in other jurisdictions. Specifically, the Supplemental Rebate Agreement employs benchmarking by requiring drug manufacturers to pay supplemental rebates that would lower their price to the state for prescriptions sold to Medicaid beneficiaries to the lowest price charged anywhere in the United States for the lowest-price drug in a given therapeutic class throughout the United States. The Non-Medicaid Agreement employs benchmarking through its requirement that drug manufacturers pay the same rebates on drugs under non-Medicaid programs as federal law requires to be paid for drugs under the Medicaid program.

86. The Secretary's approval of the Michigan Initiative and its benchmarking requirements was not in accordance with the law, was in excess of statutory limitations, and violates the APA.

87. PhRMA and its members have no adequate remedy at law.

88. The Secretary's approval of the Michigan Initiative, which violates the Act, will cause substantial, imminent and irreparable injury to PhRMA's members unless (a) that approval is vacated; (b) the Secretary is required to preclude Michigan from using Medicaid prior authorization to implement the illegal Michigan Initiative ; and (c) the Secretary is enjoined from (i) terminating the Medicaid rebate agreement of any manufacturer that refuses to pay rebates required under the illegal Michigan Supplemental Rebate Agreement or the Non-Medicaid Agreement, (ii) approving any like prior authorization formulary program in Michigan or any other state, (iii) approving any like supplemental rebate agreement for Michigan or any other state, (iv) requiring manufacturers to pay supplemental rebates, and (v) requiring manufacturers

to pay rebates on state program beneficiaries' prescription drug purchases invoiced by Michigan or by any state based on a like program.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff PhRMA respectfully requests the following relief:

A. A declaration, pursuant to 28 U.S.C. § 2201, that (1) the Secretary lacked the authority to authorize the Michigan Initiative; (2) the Initiative violates federal law; and (3) any express or implicit approval of a state Medicaid program containing the illegal features of the Michigan Initiative in the future is unlawful under the Administrative Procedure Act;

B. Preliminary and permanent injunctive relief vacating the defendants' approval and endorsement of the provisions of the Michigan Initiative.

C. Preliminary and permanent injunctive relief enjoining the Secretary from authorizing or endorsing state Medicaid programs in Michigan or any other state that contain any or all of the illegal features of the Michigan Initiative, including (i) creating drug formularies that exclude drugs for reasons that are inconsistent with the Act's limitations on such exclusion, (ii) supplemental rebates, (iii) leveraging of Medicaid beneficiaries' care to coerce rebates to non-Medicaid beneficiaries, and/or (iv) creating price benchmarks that are designed by the state to have extraterritorial impact on prices in other jurisdictions;

D. Preliminary and permanent injunctive relief enjoining the Secretary from terminating the rebate agreement of, allowing prior authorization of its drugs, or otherwise penalizing, any manufacturer that declines to pay rebates pursuant to Michigan's Supplemental Rebate Agreement or Non-Medicaid Agreement;

E. A declaration, pursuant to 28 U.S.C. § 2201, that the Secretary's approval of the Michigan Initiative violated the Act, and that therefore no rebates are payable under the Medicaid rebate agreements for drugs purchased by beneficiaries under the Michigan Initiative, and that Michigan may not impose prior authorization on any Medicaid beneficiary's use of a participating manufacturer's drugs;

F. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Jeffrey Pariser, D.C. Bar No. 462085
Donna A. Boswell, D.C. Bar No. 425502
Darrel J. Grinstead, D.C. Bar No. 064022
Jeremy T. Monthy, D.C. Bar No. 468903
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004–1109
Telephone: (202) 637–5600
Facsimile: (202) 637–5910

Attorneys for Plaintiff
Pharmaceutical Research and Manufacturers of America

Dated: June 28, 2002